Froessel, J.
Plaintiff, a New York corporation, was an export brokerage firm which acted as purchasing agent for several foreign importers, chiefly in Italy. In September, 1951 one of plaintiff’s principal Italian customers, a business entity named Garmoja, placed an order with it for 300 tons of fatty acid at a price of 37,222 American dollars. At this time the Italian foreign exchange regulations required that an importer have a permit license to pay dollars for the particular product it desired to purchase in the United States, but Garmoja had never obtained such a license. In order, therefore, to make dollars available to plaintiff in New York to enable it to purchase the fatty acids, Garmoja entered into a contract with Sicca Danti Corti (hereinafter called Corti), another Italian concern, which had obtained a permit license to pay dollars to an American named Anlyan for rags to be imported from the United States.
The contract provided that Garmoja would pay lire to an Italian bank, Crédito Lombardo, for the account of Corti, and the Italian bank would transmit a credit for the dollar equivalent, $37,222, to defendant National City Bank of New York “ in favor of ” Anlyan; Anlyan, in advance of this transfer of credit, would execute an assignment of the dollars to plaintiff, which had an account with defendant at its 26 Broadway branch. Anlyan never had an account with defendant in his own name. The transaction, in substance, contemplated the purchase of American dollars in Italy and the transfer from Corti to Garmoja of the license granted to Corti to transmit dollars to the United States for a specific import.
To carry out this arrangement, Corti obtained from Anlyan a letter addressed to defendant, instructing it to pay plaintiff the $37,222 it was to receive from Crédito Lombardo for Anlyan’s “ account ”. The letter stated defendant should treat *458 the instruction to pay plaintiff “ as irrevocable and without recourse whatsoever from my part ” (emphasis iu original). Corti delivered this letter of assignment to Garmoja, which in turn forwarded it to plaintiff to have Anlyan’s signature verified and to obtain assurance from defendant that it would pay the amount to plaintiff.
Plaintiff thereupon Avrote a letter to defendant—“ Confirming the call made by our representative at your Foreign Teller’s Office ”—with Avhich it enclosed a copy of Anlyan’s letter of assignment. Plaintiff’s letter requested defendant to authenticate Anlyan’s signature and transfer the money to its account. A memorandum was then dispatched by defendant to the “ Signature Control Department ’ ’ of its Canal Street branch stating that ‘ ‘ It is extremely important to our customer, Southwestern Shipping Corporation * * * that you inform us immediately if Mr. Armand Anlyan’s signature on the attached letter is authentic.” By reply letter, defendant confirmed the authenticity of Anlyan’s signature and, according to the uncontradicted testimony of one of plaintiff’s officers, promised to credit plaintiff’s account Avhen the money arrived.
Plaintiff then advised Garmoja that defendant had authenticated the signature and ‘ ‘ further notified us that it Avill credit our account with the total amount of the remittance and, therefore, it is understood that Ave are indebted to you for the amount of $37,222.00.” Garmoja paid 23,310,000 lire (the equivalent of $37,222) to Crédito Lombardo for Corti’s account, and the latter requested Banca d’ltalia (the official bank of Italy which must pass upon all transfers of money) to transfer $37,222 by cable to defendant to be paid to Anlyan.
On October 16, 1951 defendant received a cable in Italian from the Bank of Italy instructing it to pay Anlyan $37,222. In translating the payment instructions in this cable, however, defendant’s officials did not understand it to be the “ credit ” referred to in Anlyan’s assignment to plaintiff. Accordingly, defendant, though admittedly aware that the cable presented a problem and that the funds referred to might be those to which the assignment related, nevertheless paid the money to Anlyan, and informed him that if these Avere the funds he had assigned to plaintiff, he could indorse the check and turn it over. Anlyan then absconded and, after defendant refused *459 to pay plaintiff upon demand, plaintiff instituted this action to recover the sum.
The complaint alleged nine causes of action, sounding in money had and received, contract, and tort. The answer consisted of specific denials plus an affirmative defense alleging that each of the causes of action “ arose out of or is based upon ’ ’ a transaction which was illegal under the laws of Italy and hence 11 contrary to the public policy of the United States of America and the State of New York and unenforceable in the Courts of either.” In its charge, the trial court instructed the jury to completely disregard the affirmative defense, since it was “ purely a matter of law ”, and to consider only whether defendant had expressly or impliedly contracted with plaintiff to pay it the $37,222, and whether defendant negligently paid to a third party money which was due plaintiff.
The jury returned a verdict for plaintiff “ on the charge of breach of contract in the first instance and negligence on the part of the bank in the second ’ \ The trial court, in later setting asido the verdict on the basis of the affirmative defense, found: (1) that the agreement between G-armoja and Corti, as well as the Anlyan assignment, was illegal under Italian law, since the purchase, sale and transfer of foreign exchange was prohibited unless duly licensed by the Foreign Exchange Control Authorities of Italy; and (2) that plaintiff “was acting as agent for Garmoja in this transaction” and — by virtue of substantially common stock ownership and control—“was nothing more than an alter ego subsidiary for Garmoja ”, Accordingly, the court held that the suit was barred both by our common law and by article VIII (§ 2, subd. [b]) of the Bretton Woods International. Monetary Agreement (60 U. S. Stat. 1411; U. S. Code, tit. 22, § 286h). The Appellate Division unanimously affirmed, without opinion.
It is well settled in this State 1 £ that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose (Stone v. Freeman, 298 N. Y. 268, 271.) To this well-established principle of law, however, there is an equally well-established exception. If a party to an illegal transaction turns over money or property to a third *460 person for the use of the other party to the transaction, the latter can enforce the express or implied promise or trust of the third party to turn over the money or property, notwithstanding the fact that he could not have enforced payment or delivery by the party who voluntarily made the payment or deposit. A mere agent or depository of the proceeds of an illegal transaction will not be permitted to assert the defense of illegality in an action to recover the proceeds by a party to the illegal transaction (Murray v. Vanderbilt, 39 Barb. 140, 152-153; Merritt v. Millard, 4 Keyes 208, 213-214; Woodworth v. Bennett, 43 N. Y. 273, 276; Leonard v. Poole, 114 N. Y. 371, 379; Sheary v. O’Brien, 75 App. Div. 121, affd. 184 N. Y. 544; Stone v. Freeman, 298 N. Y. 268, 271, supra; 1 Clark, New York Law of Contracts [1922], § 654; 6 Corbin, Contracts [1951], § 1531).
Assuming, then, the illegality of the Garmoja-Corti agreement and the Anlyan assignment under Italian law, and hence under article VIII (§ 2, subd. [b]) of the Bretton Woods International Monetary Agreement, and assuming further that plaintiff was the alter ego of Garmoja, the defendant, as a mere depository or transmittal agent of the proceeds of the arrangement, had no status to assert the illegality of those transactions.
The case of Stone v. Freeman (supra), relied upon by the trial court, is not authority to the contrary. There, a clothing jobber advanced money to a broker to be illegally used to bribe purchasing agents. Although we reversed a judgment for the jobber against the broker for the amount advanced, we were careful to note: “ we are passing on the precise question here involved, and no other. This is not a case where a mere agent or depository, receiving money for his principal, refuses to pay it over, on the ground that it was the fruit of an illegal contract between his principal and another (see Murray v. Vanderbilt, 39 Barb. 140, 152; Merritt v. Millard, 4 Keyes 208; Woodworth v. Bennett, 43 N. Y. 273, 276; and the reference to such a situation, by way of dictum, in Leonard v. Poole, supra, 114 N. Y. at p. 379).” (Page 271; emphasis supplied.)
In the instant case, defendant was merely a conduit through which dollars were to pass from one principal, C'orti, to plaintiff, as alter ego of the other principal, Garmoja. It had no beneficial interest in or claim to the $37,222, and its position *461 was that of a depository into whose hands moneys were delivered for payment to another (see Sayer v. Wynkoop, 248 N. Y. 54, 57-60). Had Corti, after receiving lire from Garmoja, refused to transfer the dollar equivalent as agreed, it could not have been compelled by law to do so. Corti, however, elected to waive any defense of illegality by having the money transferred to defendant, and its agent, Anlyan, irrevocably assigned the sum to plaintiff.
Thereupon, as found by the jury, defendant promised to pay the money to plaintiff in accordance with the assignment, but by reason of its own negligence, and in breach of its agreement, paid to the wrong party. The law seems clear that defendant may not escape from its contractual liability and the consequences of its own negligence, by asserting the illegality of the antecedent agreement by reason of which it received the proceeds.
Defendant seeks to distinguish the controlling New York cases on three grounds: (1) the agent in those cases refused to pay the proceeds of the illegal transaction to its own principal; (2) the illegal transaction was completed, and (3) to have sustained the defense would have left the agent with a windfall. None of these alleged distinctions will withstand analysis. In all the relevant cases, the third party, who received the proceeds from one principal to the illegal transaction, was obligated to the other principal by virtue of a contract or trust, express or implied, to pay over the proceeds. The triers of the facts here found that defendant, after verifying the authenticity of the assignment, promised to transfer the proceeds to the account of its own depositor, plaintiff. This clearly bound defendant to transmit the funds to plaintiff and created a legally enf orcible obligation on its part to make such payment (Sayer v. Wynkoop, supra; see, also, Singer v. Yokohama Specie Bank, 293 N. Y. 542; Ehag Eisen. Holding AG. v. Banca Nat. a Romaniei, 306 N. Y. 242, 252).
As to the second claimed basis of distinction, the illegal transaction in the relevant cases was completed only in the sense that both principals had performed their part of the illegal bargain—as Garmoja did here by paying the lire and as Corti did by transmitting the dollar equivalent—and the fruits were in the hands of an agent or depository. In all the cases, *462 as here, one of the principals was seeking to recover the proceeds from the agent or depository; however, this was regarded not as a suit to consummate the illegal bargain, but to enforce an independent promise or trust to pay over the proceeds.
The situation was quite different in Dewitt v. Brisbane (16 N. Y. 508) where one of the principals had defaulted and the assignee of the other principal was seeking to recover back funds advanced under the illegal contract. The Dewitt case, which was carefully distinguished the year following in Merritt v. Millard (5 Bosworth 645, 651-652 [N. Y. Superior Ct.], affd. by this court in 4 Keyes 208, supra) and also in Kellogg v. Adams (39 N. Y. 28, 32), was in the same category as Stone v. Freeman (supra).
Finally, by being permitted to successfully maintain the affirmative defense of illegality, defendant was enabled to avoid liability for the stated sum, which the jury verdict had fastened on it. Having been found liable for breach of contract and for negligence in the sum of $37,222, defendant, solely by virtue of the illegality of the antecedent agreement, to which it was not a party, has been allowed to escape the consequences of its own wrongdoing. This constitutes a windfall as surely as if defendant had kept the proceeds and refused to turn them over.
So far as the Bretton Woods Agreement is concerned, we are unable to see how it affects plaintiff’s right to maintain this action. The pertinent provision (art. VIII, § 2, subd. [b]; 60 U. S. Stat. 1411) recites: ‘ ‘ Exchange contracts which involve the currency of any member and which are contrary to the exchange control regulations of that member maintained or imposed consistently with this Agreement shall be unenforceable in the territories of any member. ’ ’ While there is evidence that the applicable Italian foreign exchange regulations were ‘ ‘ maintained or imposed consistently with ’ ’ the Agreement, and while the quoted provision unquestionably prevents the courts of this State from enforcing illegal transactions in the field of international currency exchange, we do not see how this affects the New York common-law rule prohibiting an agent or depository from asserting a defense of illegality which the principals have elected to waive.
*463 Plaintiff here is seeking to enforce a lawful promise of payment by a party unconnected with the antecedent illegal exchange agreement. This promise was made in New York, to be performed in New York, and its enforcibility is governed by New York law. The same is true of defendant’s negligence, which was committed in New York.
The Bretton Woods Agreement adds nothing to the already settled law of this State that a party to an illegal agreement cannot enforce it against the other party. By forbidding any court in the United States from enforcing a foreign exchange contract which violates the exchange regulations of a foreign signatory to the agreement, it prevents a local court from refusing to give effect to the foreign law of a member on the ground that it is contrary to the public policy of the forum (see Perutz v. Bohemian Discount Bank in Liquidation, 304 N. Y. 533, 537), or because the foreign law provides only penal sanctions for its violation — as was the case with the Italian exchange regulations involved here — and hence should not be given extraterritorial effect (see Loucks v. Standard Oil Co., 224 N. Y. 99,102-103). In our opinion, it in no way affects the common-law rule of this State that a depository of the proceeds of an illegal transaction cannot plead the illegality of the transaction as a bar to suit against it for breach of contract and negligence.
Accordingly, the judgment appealed from should be reversed and the verdict of the jury reinstated, with costs in this court and in the Appellate Division.